(878 P.2d 833)
No. 70,396

SOUTHWESTERN BUSINESS SYSTEMS, INC., *Appellee,* v. WESTERN KANSAS XPRESS, INC., *Appellant.*
Petition for review denied 255 Kan. 1003 (1994).

Opinion filed July 22, 1994.

*Robert A. Levy,* of Garden City, for the appellant.

*Charles E. Owen, II,* of Loyd & Owen, of Garden City, for the appellee.

Before LEWIS, P.J., LARSON and GERNON, JJ.

LEWIS, J.: Southwestern Business Systems, Inc., (Southwestern) sued Western Kansas Xpress, Inc., (Western) to recover damages for a Savin copier which was purchased by Southwestern and delivered by Western. The trial court entered judgment in favor of Southwestern in the amount of $4,027.90, plus $895 in attorney fees and $98 in costs. The court then ordered the damaged copier returned to Western so that it would have the benefits of any salvage value. Western appeals from the decision of the trial court.

We affirm.

## FACTUAL BACKGROUND

Southwestern purchased a Savin copy machine from Central Office Products (Central) in Salina for $4,207.90. Central has its principal place of business in Salina, and Southwestern is located in Garden City. Western is a common carrier, operating within the state of Kansas, and, as such, picked up the copier in Salina and delivered it to Southwestern in Garden City.

When Western picked up the copier from Central, its driver signed a receipt indicating that the copier was in good condition. This receipt was signed despite the fact that Western did not open the box and inspect the copier. In fact, it appears that rules and regulations relative to the delivery and shipping of merchandise do not allow such an inspection.

The copier was picked up in Salina, taken to Wichita, unloaded and placed on a different truck, and then delivered to Garden City. When the copier was delivered to Southwestern, its agent signed a receipt indicating it was "received in good condition." As in the case of Western, the Southwestern representative did not open the box and inspect the copier before signing the receipt. Again, the applicable rules and regulations apparently do not permit a buyer to open the box and inspect the contents prior to taking delivery. The agent for Southwestern testified that he did not note any damage when the delivery was received.

The copier sat in the Southwestern storeroom unopened for 9 or 10 days after delivery. There were a number of Southwestern employees in and out of the storeroom during that time, and the storeroom was monitored each business day by the receiving clerk for Southwestern. The testimony indicated that nothing heavy was placed on the top of the box during the time it was in the storeroom in the possession of Southwestern.

When Southwestern finally opened the box, it found the copy machine had been extensively damaged. The top glass on the copier was broken, and glass particles were scattered throughout the machine. The top rail or scanner of the copier was bent down at a 90-degree angle and was inoperable. The box had a circular indentation on the top, directly above where the damage occurred.

The evidence indicated the copier was manufactured in Japan and ultimately delivered to Salina where it became part of the inventory of Central. When the copier was ordered by Southwestern, it was located in Salina in the inventory of Central.

## INTRASTATE OR INTERSTATE?

One of the primary issues which we must determine is whether the shipment of the copier from Salina to Garden City was by intrastate or interstate commerce. The trial court held that the shipment was intrastate and that K.S.A. 66-304 applied to the shipment. We agree with the trial court.

K.S.A. 66-304 provides:

"Any common carrier receiving property for the transportation from one point in this state to another point in this state shall issue a receipt or bill of lading therefor and such carrier or any other common carrier to which said property may be delivered or over whose line or lines such property may pass *shall be liable to the owner of such property for any loss, damage or injury caused by any one or more of said carriers,* and no contract, rule or regulation shall exempt any of such common carriers from the liability hereby imposed: *Provided,* That nothing in this section shall deprive any owner of such property or any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law. That the common carrier which shall pay such loss, damage or injury shall be entitled to recover from the common carrier on whose line or lines the loss, damage or injury shall have been sustained the amount of such loss, damage or injury, as it may be required to pay to the owner of such property, as may be evidenced by any receipt, judgment or transcript thereof." (Emphasis added.)

K.S.A. 66-305 provides that any common carrier which refuses to pay any liability imposed by 66-304 for 60 days after demand for payment has been made shall be liable to the owner of the property damaged for a reasonable attorney fee to be fixed by the court.

Under the interstate commerce act, Southwestern would be required to prove "delivery in good condition and receipt in damaged condition." *Wentz Equip. Co. v. Missouri Pacific R.R. Co.,* 9 Kan. App. 2d 141, Syl. ¶ 2, 673 P.2d 1193 (1983), *rev. denied* 235 Kan. 1042 (1984). Western argues that the shipment was interstate and that the rules applying to interstate shipment govern this action.

There are a number of relatively dated Kansas decisions on the subject. One of the more recent decisions is *First National Bank v. Bankers Dispatch Corporation,* 221 Kan. 528, 562 P.2d 32 (1977), in which a shipment was picked up in Girard, taken across the state line into Missouri, and then brought back into Kansas for delivery. The court held that, under these facts, the shipment was considered to be interstate commerce. In *Case v. Union Pac. Rld. Co.,* 119 Kan. 706, 241 Pac. 693 (1925), a train shipment of plums came from Oregon to Kansas. After the train entered Kansas, the plums were paid for and some of the boxes of plums were removed. The purchaser requested that the remainder of the plums be sent on to another Kansas town. The shipment was made on the same train but under a different bill of lading. The court held that the shipment from one Kansas town to another was intrastate commerce. We note that, in the present case, the shipment from Salina to Garden City was made under a separate bill of lading from the earlier shipment of the copier to Salina.

In *In re Pringle,* 67 Kan. 364, 72 Pac. 864 (1903), a seller took orders for sample products and had the merchandise shipped in from another state, pursuant to such orders. The goods were shipped to the seller and he paid for them before distributing them to those he had solicited orders from. Although the seller represented himself as a representative of the out-of-state supplier, the court held that his delivery to his buyers was conducted in intrastate commerce because the foreign merchant from whom the goods were originally ordered had no contact with the ultimate purchaser:

"Under these facts, it is clear that from the time the petitioner paid to the express company the price of the goods demanded by his vendor, until the time he delivered them to his customers, the goods belonged to him. Therefore, the petitioner actually sold and delivered his own goods, and, whatever the form employed or guise adopted, the orders he received were in fact taken for himself." 67 Kan. at 366.

In general, shipments from one point in Kansas to another point in Kansas have been held to be intrastate commerce. *Anderson Cattle Co. v. Atchison, T. & S. F. Rly. Co.,* 167 Kan. 306, 312, 206 P.2d 124 (1949). On the other hand, shipments directly across the state line have been uniformly held to be

interstate commerce. See *Andrews v. Railroad Co.*, 99 Kan. 347, 349, 161 Pac. 600 (1916); *Leibengood v. Railway Co.*, 83 Kan. 25, 27, 109 Pac. 988 (1910); *Gay v. Graves Truck Line, Inc.*, 1 Kan. App. 2d 704, 573 P.2d 632 (1977).

The United States Supreme Court has spoken on this issue. In *Harvester Co. v. Dept. of Treasury*, 322 U.S. 340, 88 L. Ed. 1313, 64 S. Ct. 1019 (1944), an out-of-state buyer came to Indiana, purchased and took delivery of goods, and then immediately shipped the goods out of the state. The Supreme Court concluded that the sale was one conducted in intrastate commerce. "[I]t is immaterial to the present issue that the goods are to be transported out of Indiana immediately on delivery. Moreover, both the agreement to sell and the delivery took place in Indiana." 322 U.S. at 345. In fact, the Court has indicated that mere incidents of interstate commerce would not make the transaction interstate commerce when the contract, delivery, and payment were all made in the same state. See *Banker Brothers v. Pennsylvania*, 222 U.S. 210, 56 L. Ed. 168, 32 S. Ct. 38 (1911).

The cases also indicate that while shipment of goods from a foreign state is an incident of interstate commerce, once that shipment is held "at an intermediate point between the place of shipment and ultimate destination, [it] may cease to be a subject of interstate commerce." *General Oil Co. v. Crain*, 209 U.S. 211, 229-30, 52 L. Ed. 754, 28 S. Ct. 475 (1908).

We conclude from the authorities cited above that once goods have been shipped in interstate commerce to a point in Kansas and become a part of the inventory of a merchant in Kansas, those goods cease to be a subject of interstate commerce. If the next shipment of the goods out of inventory is to another point in Kansas, the shipment will be considered intrastate. We hold that the shipment in the instant matter was a shipment in intrastate commerce and that K.S.A. 66-304 is applicable. This shipment was from Salina to Garden City. The transport process did not leave the boundaries of the state of Kansas. The shipment from Salina was under a different bill of lading than the original shipment of the copier to Salina. Southwestern had no contact with any supplier other than Central. The contract, delivery, and payment were all made in Kansas. The trial court did not err in concluding that the shipment was intrastate.

## LIABILITY

Notwithstanding the application of K.S.A. 66-304, it was still incumbent upon Southwestern to prove that Western caused the damage to the machine. We do not conclude that 66-304 imposes anything akin to strict liability upon the common carrier. Western argues that there is no substantial competent evidence in the record to support a finding that it damaged the copier in shipment.

The question of who is responsible for the damage was a question of fact. The trial court made findings of fact in this case, one of which was that "[t]he Defendant received the goods in good condition, and the Plaintiff received the goods in a damaged condition."

Our standard of review in cases of this nature has been often stated: "The court must determine if the findings are supported by substantial competent evidence and whether they are sufficient to support the trial court's conclusions of law." *Army Nat'l Bank v. Equity Developers, Inc.*, 245 Kan. 3, 19, 774 P.2d 919 (1989). Further,

"[w]hen a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. [Citations omitted.]" *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988).

It has also been held: "In reviewing the decision of a trial court, this court must accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court, and must disregard any conflicting evidence or other inferences that might be drawn therefrom." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377-78, 855 P.2d 929 (1993).

In applying the standards of review quoted above, we hold that the trial court's findings of fact are supported by substantial competent evidence. There is evidence in the record that, if believed, establishes that Western received the goods in good condition from Central. The employees of Southwestern testified they did nothing to cause the damage and placed nothing on top of the box that caused the indentations on that box. The conclu-

sion could be reached, therefore, that the indentation on the box and the damage to the copier occurred during shipment. The evidence is circumstantial and not overwhelming. Indeed; it might support a verdict for either party. The trial court chose to believe the evidence produced by Southwestern, and that is the function of the trier of fact:

"Circumstantial evidence, in a civil case, in order to support a verdict need not rise to that degree of certainty which will exclude every reasonable conclusion other than that reached by the jury. It suffices that such evidence affords a basis for a reasonable inference by the court or jury of the occurrence of the fact in issue, although some other inference equally reasonable might be drawn therefrom." *Arterburn v. St. Joseph Hospital & Rehabilitation Center,* 220 Kan. 57, Syl. ¶ 1, 551 P.2d 886 (1976).

The evidence in this case affords a basis for a reasonable inference that the damage occurred in shipment. We will not second-guess that factual finding of the trial court, and we affirm its decision in this regard.

## DAMAGES

Western argues that the damages awarded by the trial court are not supported by substantial competent evidence. We disagree.

"Where a trial court has fashioned a remedy to make the injured party whole, the test on appellate review is not whether the remedy is the best remedy that could have been devised, but whether the remedy so fashioned is erroneous as a matter of law or constitutes a breach of trial court discretion." *Gillespie v. Seymour,* 250 Kan. 123, Syl. ¶ 10, 823 P.2d 782 (1991).

In the instant matter, the trial court awarded damages amounting to the full price of the copier, $4,027.90. The damaged copier was awarded to Western so that it would be able to take advantage of any salvage value. Western argues that Southwestern failed to prove the actual value of damages to the copier.

Our review of the record indicates that there is sufficient evidence from which the trial court could conclude that the copier was totaled. George Nuzum, the Southwestern purchasing agent, testified that the damages to the copier would be very difficult to repair and that the repair would cost more than a new copier. Nuzum was unable to evaluate the salvage value or the exact cost of the new copier. The president of Southwestern testified that,

in order to fix the copier, it would have to be torn down to the frame so as to remove all of the glass particles and then completely rebuilt. It was his opinion that the labor to repair the machine would cost more than buying another machine. He indicated that he had contacted the manufacturer's repair representative but that this individual was unwilling to try to repair the copier.

In this case, the following rule is applicable: " 'The rule of damages generally followed in this state is that when personal property cannot economically be restored to its former condition, the measure of damages is the difference between its fair and reasonable market value immediately before and immediately after the damage.' " *Kansas Power & Light Co. v. Thatcher*, 14 Kan. App. 2d 613, 616, 797 P.2d 162, *rev. denied* 247 Kan. 704 (1990).

The evidence presented at the trial of this lawsuit indicates that the copier could not be economically repaired. Western presented nothing to rebut this evidence produced by Southwestern. It is true that, under the trial court's award, Western must repay the full cost of the copier. However, it has possession of the damaged copier, so if there is any salvage value, Western will get the benefit. It appears to us that this award of damages places both parties in as good a position as possible.

The evidence is virtually undisputed that the copier will cost more to repair than to replace. Consequently, we conclude that the trial court did not err in awarding to Southwestern the full purchase price of the copier as its damages. Any possible prejudice to Western by this award is offset by awarding to it the copier itself and the right to recover any salvage value.

Affirmed.